UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------- x

PSI MARINE, INC., and MARK R. BALUHA    :

                                 :

               Plaintiffs,      :

                                 :

       v.                 :         3:24-CV-00163 (SFR)

                                 :

SEAHORSE DOCKING LLC,         :

                                 :

             Defendant.      :

---------------------------------------------------------------- x

**MEMORANDUM & ORDER**

Plaintiffs PSI Marine, Inc. ("PSI Marine") and Mark R. Baluha ("Baluha") filed a twelve-count action against Defendant Seahorse Docking LLC ("Seahorse") alleging infringement of PSI Marine's trademark, false advertising, copyright infringement, and related claims under Connecticut state law. The parties have filed cross motions for partial summary Judgment. ECF Nos. 101, 102. PSI Marine's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part, and Seahorse's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part.

I.     **BACKGROUND**

    A.    **Factual Background**

The following facts are undisputed unless otherwise noted.[1] The dispute centers around four products, and their product names, the TideSlide product and senior trademark owned by

---

[1] The factual background is drawn from facts admitted in PSI Marine's Local Rule 56(a)2 Statement of Facts submitted in response to Seahorse's Motion for Summary Judgment, ECF No. 108-1 ("Pls.' L.R. 56(a)2 St.") (redacted version at ECF No. 109-1), facts admitted in Seahorse's Local Rule 56(a)2 Statement of Facts submitted in response to PSI Marine's Motion for Summary Judgment, ECF No. 113-1 ("Def.'s L.R. 56(a)2 St.") (redacted version at ECF No. 112-1), and various exhibits attached to these statements. Citations to the Rule 56(a)2 Statements are by

1

PSI Marine and Baluha, and the Sea Slide, Tide Right, and Flex Slide products and junior trademarks owned by Seahorse.

TideSlides and Sea Slides are both used to secure boats for fluctuating and non-fluctuating tides. Def.'s L.R. 56(a)2 St. ¶ 55, ECF No. 112-1. The Tide Right product has "an integrated float that adjusts other parts of the product, such as a fender, with changing tides." Def.'s L.R. 56(a)2 St. ¶ 21. The Flex Slide product, used to secure docks, "is a flexible belt, with a mount connecting to floating docks of different brands and styles, that floats up and down with the tide on a slide, that attaches to a dock or seawall." *Id.* ¶ 20.[2]

PSI Marine is a corporation located in Saginaw, Michigan. Pls.' L.R. 56(a)2 St. ¶ 1, ECF No. 108-1. Baluha is an owner and President of PSI Marine. *Id.* at ¶ 2. Baluha owns the registered trademark TIDESLIDE (Reg. No. 2,780,666), for mooring products for docks and watercraft. Def.'s L.R. 56(a)2 St. ¶ 2. Baluha licenses the TIDESLIDE trademark to PSI Marine, which is and has been the exclusive licensee since 2002. *Id.* ¶ 3. The TIDESLIDE trademark is incontestable. *Id.* ¶ 5.

Seahorse is a limited liability company located in Manchester, Connecticut. Pls.' L.R. 56(a)2 St. ¶ 3. Carmen Martocchio ("Martocchio")[3] owns Seahorse. Def.'s L.R. 56(a)2 St. ¶ 12. Martocchio learned of the TideSlide product and mark in 2017 or 2018, when he purchased

---

paragraph number. With respect to other documents, page citations are to the page number generated by the ECF system.

[2] Photos of the products appear in the Appendix. The photos appear in the Complaint and are included here to assist the reader in following this Opinion.

[3] Carmen Martocchio has two sons, Anthony and Vincent Martocchio. I will refer to Carmen Martocchio as "Martocchio" and his sons by first and last name.

a house with TideSlides installed on the dock.[4] *Id.* ¶ 13. Martocchio removed the TideSlides from his dock and gave them to Bill Kropp, a mechanical engineer. *Id.* ¶ 14. Martocchio directed Kropp to create a product model of the TideSlide, and Kropp created a dimensional drawing in either 2017 or 2018. *Id.* ¶ 15. Martocchio was inspired to enter the marine product manufacturing business because of TideSlides, although the parties disagree to the extent he wanted to replicate TideSlides or make a better version. *Id.* ¶ 16.

Martocchio entered the marine product manufacturing business, in part, by buying assets of a company called Seahorse Fender & Docking, LLC ("Seahorse Fender & Docking"). *Id.* ¶¶ 40. Michael Moran owned and operated Seahorse Fender & Docking between 2015 and 2020. Moran was aware of the TIDESLIDE trademark at the time he entered the marine manufacturing business by starting Seahorse Fender & Docking. *Id.* ¶ 17. Seahorse Fender & Docking sold Flex Slide and Tide Right products. Tide Right was first introduced to the market around 2016 or 2017, and Flex Slide was first sold approximately in late 2018. *Id.* ¶ 18.

Moran is the inventor of U.S. Patent No. 9,302,750 B2 (the '750 Patent), titled Self-Leveling Boat Bumper System, and he designed the subject matter of the '750 Patent. He believes the '750 Patent covers Seahorse's Tide Right product. *Id.* ¶ 23. Moran designed the Tide Right to have a cleat, but admitted the written description of the patent provides that the cleat is optional. *Id.* ¶ 25. Moran is also the named inventor of U.S. Patent No. 9,556,575 B2 (the '575 Patent), titled Adjustable Self-Leveling Boat Bumper System, and he designed the subject matter of the '575 Patent. *Id.* ¶ 26.

---

[4] From here on, "TIDESLIDE" shall be used to refer to the legal trademark, while "TideSlide" shall refer to the products manufactured by PSI Marine under the TIDESLIDE trademark.

Moran and the other co-owner of Seahorse Fender & Docking executed an Asset Purchase Agreement (the "APA") on behalf of Seahorse Fender & Docking and sold SFD's assets to Trident Marine Products. *Id.* ¶ 40. PSI Marine contests which assets exactly were covered by the APA. *Id.* ¶ 37.

Martocchio formed Trident Marine Products, LLC, on October 14, 2020. Trident Marine Products, LLC changed its name to Seahorse Docking LLC ("Seahorse"), by filing a Certificate of Amendment with the Secretary of the State of Connecticut on December 18, 2020. *Id.* ¶ 42. Seahorse continued to manufacture and sell the Tide Right and Flex Slide products after the Seahorse Fender & Docking purchase, and introduced a new product, the Sea Slide, in 2021. *Id.* ¶ 45. Seahorse advertises its Tide Right product as offering an "Adjustable Self-Leveling Docking System with an engineered and patented self-adjusting fender and cleat." *Id.* ¶ 32; *see also* ECF 97-13. Seahorse denies selling TideSlides. *Id.* ¶ 47. Seahorse has not received a product endorsement of any kind from PSI Marine or Baluha, or permission or consent to use the TIDESLIDE mark. *Id.* ¶ 48. Seahorse utilized Kropp's TideSlide dimensional drawings to create the Sea Slide. *Id.* ¶ 50.

The decision to use the product name SEA SLIDE was made after Seahorse utilized Kropp's TideSlide dimensional drawings that included the names "TIDESLIDE or TIDE SLIDE". *Id.* ¶ 50. Past purchasers have emailed Seahorse pictures of damaged Seahorse products and referred to "Tide slides." *Id.* ¶ 59. Seahorse customers or potential customers have inquired about Seahorse products and referred to them as "tide slides." *Id.* ¶ 60. Seahorse rebranded its Sea Slide product as Rough Rider in August of 2022. Def.'s L.R. 56(a)2 St. ¶ 72.

The parties retained experts to conduct trademark surveys. Pls.' L.R. 56(a)2 St. ¶ 10. The net confusion numbers presented in the survey results measure the level of confusion with

4

PSI Marine's TIDESLIDE trademark caused by the accused product names. *Id.* ¶ 13. Trademark survey experts rely on the net confusion numbers to show confusion caused by the trademark over the baseline confusion in the marketplace. *Id.* ¶ 14. Baseline confusion reflects confusion that exists in the marketplace that is not attributable to the accused product names. *Id.* ¶ 15. Plaintiffs' trademark survey results showed a net confusion number of 7.5% across all three products, with 13.1% for the "Sea Slide" product name, 5.7% for the "Tide Right" product name, and 0.3% for the "Flex Slide" product name. Keegan Deposition, ECF No. 97-7, at 115: 20-24; Def.'s L.R. 56(a)2 St. ¶ 16. In prior cases, Plaintiffs' survey expert has opined that no likelihood of confusion exists when trademark survey results show less than 15% net confusion. *Id.* ¶ 21. Plaintiffs admit that the "SlideMoor" product name does not infringe the TIDESLIDE trademark and Plaintiffs' trademark survey expert used SlideMoor in his survey as a non-infringing product for one of the survey control cells. *Id.* ¶ 23.

Baluha owns a registered copyright in the TideSlide Price Guide 2022, copyright registration TX 9-112-659. Def.'s L.R. 56(a)2 St. ¶ 78. The TideSlide Price Guide 2022 was published on tideslide.com, and printed and distributed at boat shows, including the International Boat show 2021. *Id.* ¶ 79. Anthony and Carmen Martocchio attended the Fort Lauderdale International Boat Show in October of 2021 on behalf of Seahorse. *Id.* ¶ 80. Seahorse maintained a stored copy of PSI's TideSlide online store webpage used to market and sell TideSlides. *Id.* ¶ 82. The stored copy of the webpage included within it the TideSlide Price Guide 2022. ECF No. 100-6, at 41-42, 78-82. In or about November 2021, Seahorse published a price guide for Sea Slide products, known as the Sea Slide Price Guide. *Id.* ¶ 81. Seahorse employee Courtney Cuison created the Sea Slide Price Guide and chose the

contents—the data, words, and numbers—in the Sea Slide Price Guide. *Id.* ¶ 83. Anthony Martocchio directed her actions in doing so. *Id.*

PSI Marine originally filed a lawsuit against Seahorse on March 22, 2022 in the U.S. District Court for the Eastern District of Michigan, which was captioned *PSI Marine, Inc. v. Seahorse Docking LLC*, 1:22-CV-10611 (E.D. Mich.) (the "Eastern District of Michigan Case"). Pls.' L.R. 56 (a)(2) St. ¶ 4. The Eastern District of Michigan Case was dismissed for lack of personal jurisdiction over the Defendant in Michigan on September 18, 2023. *Id.* ¶ 5.

### B.    Procedural History

On February 7, 2024, PSI Marine filed its initial complaint in the present case in the District of Connecticut. ECF No. 1. On March 28, 2024, Seahorse filed a Motion to Dismiss the Complaint. ECF No. 28. On April 12, 2024, PSI Marine, joined by Mark Baluha, filed a twelve count Amended Complaint against Seahorse. Am. Comp., ECF No. 31. On May 3, 2024, Seahorse filed a Motion to Dismiss the Amended Complaint. ECF No. 36. On May 3, 2024, the Court,[5] in light of Seahorse's Motion to Dismiss the Amended Complaint, denied the Motion to Dismiss the original Complaint as moot. ECF No. 37. On November 24, 2024, the Court denied the Motion to Dismiss the Amended Complaint. ECF No. 68. On December 31, 2024, Defendant filed its Answer, Counterclaim, and Affirmative Defenses to the Amended Complaint. ECF No. 81.

This case was transferred to me on January 6, 2025. ECF No. 84.

On June 27, 2025, Plaintiffs filed their Motion for Partial Summary Judgment and supporting Memorandum asserting that this Court can determine Counts I-VII, Count IX, and

---

[5] The Honorable Sarala Nagala presided over this action before it was transferred to me.

Count XII in their favor based on undisputed facts. ECF No. 100; ECF No. 100-19 ("Pls.' Mem"). On June 30, 2025, Seahorse filed its own Motion for Partial Summary Judgment and supporting Memorandum asserting that this Court can determine Counts II, III, and V-IX in its favor based on undisputed facts. ECF No. 102; ECF No. 98 ("Def.'s Mem.").

On July 18, 2025, Plaintiffs filed their Memorandum in Opposition to Defendant's Motion for Summary Judgment. ECF No. 108 ("Pls.' Opp."). That same day, Seahorse filed its Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment. ECF No. 113 ("Def.'s Opp.").

On July 31, 2025, Seahorse filed its Reply in support of its Motion for Partial Summary Judgment. ECF No. 116 ("Def.'s Reply"). On August 1, 2025, Plaintiffs filed their Reply in support of their Motion for Summary Judgment. ECF 118 ("Pls.' Reply").[6]

On March 3, 2026, I held oral argument on the cross motions for summary judgment. ECF No. 142.

## II.    <u>LEGAL STANDARD</u>

A motion for summary judgment must be granted if the record shows no genuine issue as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

---

[6] Both parties filed sealed as well as redacted versions of their briefs and various exhibits. I addressed their motions to seal through separate orders.

(1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48. The moving party may satisfy this burden by pointing out to the district court an absence of evidence to support the non-moving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*

When deciding a motion for summary judgment, I may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c). In reviewing the record, I must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

"Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute." *AFS/IBEX v. AEGIS Managing Agency Ltd.*, 517 F. Supp. 3d 120, 123 (E.D.N.Y. 2021). "Thus, even if both parties move for summary judgment and assert the absence of any genuine issues of material fact, 'a district court is not required to grant judgment as a matter of law for one side or the other.'" *Id.* (quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). Each party's motion will be "examined on its own merits" and in each case "all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## III.    **DISCUSSION**

The parties' arguments can be broken down in five categories, (A) the allegations relating to trademark infringement contained in Counts I-VI; (B) the allegations of false advertising in Counts VII and VIII; (C) Seahorse's claimed equitable defenses to Counts II, III, and V-VII; (D) allegations of copyright infringement contained in Count IX; and lastly, (E) alleged state law violations of Count XII. I examine each section in turn.

### A.    **Infringement on Counts II, III, V and VI**

The parties have filed cross motions for summary judgment on Counts II, III, V, and VI. Def.'s Mem. 4; Pls.' Mem. 3. Counts II and V allege infringement of PSI Marine's TIDESLIDE by Seahorse's TIDE RIGHT name, whereas Counts III and VI allege infringement by Seahorse's FLEX SLIDE name. In addition, PSI Marine[7] moves for summary

---

[7] Moving forward, I will refer to the Plaintiffs collectively as "PSI Marine."

judgment on Counts I and IV, which allege infringement by Seahorse's SEA SLIDE name. Seahorse does not cross move for summary judgment on Counts I and IV.

Section 32 of the Lanham Act prohibits the unauthorized use in commerce of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). Section 43(a) of the Lanham Act similarly prohibits the infringement of unregistered, common law trademarks. *See* 15 U.S.C. § 1125(a)(1); *see also Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999).

To succeed on a trademark infringement or an unfair competition claim under the Lanham Act, a plaintiff must prove that: (i) the plaintiff's mark is entitled to protection; and (ii) defendant's use of the allegedly infringing mark would likely cause confusion with the plaintiff's mark. *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009); *see also Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 224 (2d Cir. 2012) ("[W]e analyze a trademark infringement claim in two stages, asking first whether the mark merits protection and, second, whether the allegedly infringing use of the mark (or a similar mark) is likely to cause consumer confusion.") (internal quotation marks and citation omitted). "Preliminary to making this showing, however, a plaintiff must demonstrate its own right to use the mark or dress in question." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2d Cir. 2007).

If a mark merits protection, the crucial issue becomes "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed

simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978).

Seahorse acknowledges that the TIDESLIDE trademark is incontestable. Def.'s L.R. 56(a)2 St. ¶ 5. Consequently, I discuss only the second element required by the Lanham Act: whether Seahorse's use of the marks is likely to cause consumer confusion.

To determine whether there exists a likelihood of confusion, courts apply the eight-factor balancing test introduced in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). The factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Starbucks Corp.*, 588 F.3d at 115. "The application of the *Polaroid* test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016) (internal quotation marks and citation omitted). Although no one factor is dispositive, and in some cases, a factor may be irrelevant to the facts before it, "it is incumbent upon the district judge to engage in a deliberate review of each factor, and, if a factor is inapplicable to a case, to explain why." *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995) (citation omitted). "If a factual inference must be drawn to arrive at a particular finding on a *Polaroid* factor, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary judgment." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996).

Ultimately, "[t]he question of whether there is a likelihood of confusion is usually reserved for a jury, as it requires a fact intensive examination of the probable reactions of prospective purchasers of the parties' goods." *Lion-Aire Corp. v. Lion Air Installation, Inc.*, 747 F. Supp. 3d 488, 507 (E.D.N.Y. 2024).

Before I apply the *Polaroid* test, I note that PSI Marine urges me to examine the allegedly infringing marks conjointly, and conclude that with the marks considered all together, there is a likelihood of confusion with the TIDESLIDE trademark. Pls.' Mem. 13. "The conjoint use rule in certain instances allows a trademark owner who uses two marks conjointly to combine the marks for comparison with an accused mark." McCarthy on Trademarks and Unfair Competition § 23:61.25 (5th ed.). As the description implies, however, the conjoint use rule applies when the *trademark owner* uses more than one mark. Courts have applied the conjoint use analysis only in cases where the senior owner owns multiple trademarks, not where the junior user has multiple allegedly infringing marks. *See, e.g.*, *Muddy Bites, Inc. v. Evergreen USA LLC*, 2025 WL 1079494, at *8 (S.D.N.Y. 2025); *Vida Enterprise Corporation v. Angelina Swan Collection, Inc.*, 2023 WL 2895702 at *9 (C.D. Cal. 2023); *see also Schering-Plough Healthcare Prods., Inc.*, 84 U.S.P.Q.2d 1323, at *4 (T.T.A.B. 2007); *Bell's Brewery, Inc. v. Innovation Brewing*, 125 U.S.P.Q.2d 1340, 1349, 2017 WL 6525233 (T.T.A.B. 2017). Even in the case cited by PSI Marine, the conjoint use analysis applied to the conjoint use of multiple marks by the plaintiff and senior owner. *See Starsurgical Inc. v. Aperta, LLC*, 40 F. Supp. 3d 1069, 1080 (E.D. Wis. 2014). Thus, I conclude that I must apply the *Polaroid* factors independently to each of Seahorse's three marks. For the sake of concision, however, I evaluate each *Polaroid* factor for the three allegedly infringing marks within the same section below.

### 1.    Strength of the Marks

The first *Polaroid* factor, the strength of the senior user's mark, is defined as the "tendency to identify the goods as coming from a particular source." *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 581 (2d Cir. 1991) (internal quotation marks and citation omitted).

"Basic to an assessment of the strength . . . is 'the rule that registered marks are presumed to be distinctive and should be afforded the utmost protection.'" *Nabisco Brands, Inc. v. Kaye*, 760 F. Supp. 25, 27 (D. Conn. 1991) (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) "Marks are entitled to a presumption of inherent distinctiveness by virtue of their incontestability." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 451 (2d Cir. 2004).

"When determining a mark's strength, courts consider both the mark's inherent distinctiveness, based on the characteristics of the mark itself, and its acquired distinctiveness, based on associations the mark has gained through use in commerce." *Akiro LLC v. House of Cheatham, Inc.*, 946 F.Supp.2d 324, 333 (S.D.N.Y. 2013) (citation omitted); *see also Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 147 (2d Cir. 2003).

Seahorse contends that TIDESLIDE's descriptive name and low sales volume make it a weak trademark. Def.'s Mem. 19. In particular, Seahorse observes that PSI Marine's average sales totaled fewer than 1,000 units per year from 2020 to 2024. ECF No. 98-13, at 64. Moreover, many of these units were sold in batches, sometimes as high as 18 units per batch. *Id.* at 61. PSI Marine responds that the TIDESLIDE trademark is not merely descriptive, but

instead suggestive, and that PSI Marine has used TIDESLIDE for more than twenty years. Pls.' Mem. 9; Def.'s L.R. 56(a)2 St. ¶ 3.[8]

TIDESLIDES is entitled to a presumption of inherent distinctiveness because it is an incontestable trademark. Although the weak sales of TIDESLIDES counsels in favor of Seahorse, this finding does not overcome the presumption of distinctiveness. Therefore, I conclude that the TIDESLIDES mark is sufficiently strong such that this first *Polaroid* factor weighs in favor of PSI Marine.

### 2.    Similarity of the Marks

The second *Polaroid* factor concerns the similarity of the parties' marks. "In assessing similarity, courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr USA Pub.*, 991 F.2d at 1078 (citations omitted). "[S]ide by side comparison is not the appropriate test. Rather, the correct test is whether a consumer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with defendant's mark alone." *Akiro LLC*, 946 F. Supp. 2d at 334 (internal quotation marks and citation omitted).

Here, the three marks are similar, but certainly not identical. As PSI Marine observes, like TIDESLIDE, each of the three allegedly infringing marks, FLEX SLIDE, SEA SLIDE and TIDE RIGHT, use a similar punchy two-syllable moniker. Pls.' Mem. 10-15. Each syllable

---

[8] "Trademark law uses a four-category typology to delineate the inherent distinctiveness of a mark: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 238 (S.D.N.Y. 2022), *aff'd*, No. 23-12-CV, 2024 WL 1152520 (2d Cir. Mar. 18, 2024). Marks that are more inherently distinctive are afforded greater protection. *Id.*

consists of a short, identifiable word. Furthermore, each of the three allegedly infringing marks uses one of the words that makes up TIDESLIDE (Slide for two and Tide for one). SEA SLIDE's nonmatching syllable, "SEA," still has a similar meaning to "Tide"—as both words evoke the ocean and boating. On the other hand, as Seahorse articulates, all of Seahorse's marks are two words with a space in between, unlike the one-word TIDESLIDE. Def.'s Mem. 9. Furthermore, while the "Sea" in SEA SLIDE evokes the Tide in TIDESLIDE, "flex" does not hearken to tide nor right to slide.

Courts in this Circuit have observed that marks distinguished by a single word can generate confusion. For example, in assessing the similarity between "Toys R Us" and "Kids R Us," the court found "that while the marks are clearly distinguishable when placed side by side, there are sufficiently strong similarities to create the possibility that some consumers might believe that the two marks emanated from the same source. The similarities in sound and association also create the possibility that some consumers might mistake one mark for the other when seeing or hearing the mark alone." *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1197-98 (E.D.N.Y. 1983).

I conclude that I cannot resolve this factor as a matter of law in favor of either party as to any of the marks. A jury could reasonably distinguish the marks. But a reasonable jury could also infer from the use of a matching syllable in each allegedly infringing mark and the two syllable construction that consumers might mistake one mark for the other. Though SEA SLIDE may bear a stronger resemblance to TIDE SLIDE than TIDE RIGHT or FLEX SLIDE, only a finder of fact can resolve how to weigh this disputed evidence. Thus, at this stage, the second *Polaroid* factor cannot be resolved as a matter of law in favor of either party with respect to any of the marks. *See Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324,

335 (S.D.N.Y. 2013) ("The Court thus concludes that this factor cuts against both parties' summary judgment motions, because whether the factor favors plaintiff or defendant is a function of whether one takes the evidence in the light most favorable to the defendant on plaintiff's motion or to the plaintiff on defendant's motion.").

### 3.    Proximity of the Marks

"This factor focuses on whether the two products compete with each other. To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *Lang*, 949 F.2d at 582 (citation omitted).

"Products which directly compete in the marketplace clearly warrant a finding of the highest degree of competitive proximity, which is a strong indication of likelihood of confusion." *CSL Silicones, Inc.*, 301 F. Supp. 3d at 358 (internal quotation marks omitted). In this case, there is no dispute Seahorse's Sea Slide and PSI Marine's TideSlide products are designed for the same customers and compete with each other. As Seahorse rightly concedes, "Plaintiff's TideSlide product is similar in construction to Defendant's Rough Rider product, which was formerly named Sea Slide." Def.'s Mem. 23 n.2.

I similarly conclude that the parties' other marks compete in the same marketplace. Seahorse states, without further explanation, that the "Tide Right and Flex Slide products serve different customers with different needs from those who purchase Seahorse's Rough Rider product or Plaintiffs' TideSlide product." Def.'s L.R. 56(a)2 St. ¶ 72. However, Seahorse's Tide Right and Flex Slide products are in close proximity to PSI Marine's TideSlide product. Although the Flex Slide product helps secure docks whereas Tide Right and Tideslide help secure boats, all three products are mooring products. Even if one views the evidence in the

16

light most favorable to Seahorse—and accepts that Flex Slide and Tide Right have slightly different functions and cater to slightly different needs than TideSlide—all the products are part of the same general class (mooring products) and serve the same customers (boating owners seeking to moor their boats and docks). To draw such a narrow distinction between the specific type of mooring product is to ignore the case law's prescription to consider whether products fall within the same *general* class. Customers are more likely to confuse the source of different mooring products than they are to have trouble distinguishing the source of products in completely different fields. Accordingly, I conclude that *Polaroid* factor three favors PSI Marine as to all three marks—although most strongly for the Sea Slide product and least strongly for Flex Slide product.

### 4.    Bridging the Gap

This factor "seeks to protect the senior user's interest in being able to enter a related field at some future time." *Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 517 (S.D.N.Y. 1993). Where, as here, the parties' products are already in competitive proximity, "there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005) (treating this factor as neutral where both parties used marks on liquor bottle labels); *accord Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (treating this factor as neutral because both parties used marks in connection with the sale of coffee products); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 496 (S.D.N.Y. 2015) (treating factor as neutral because parties' marks appeared on sunglasses).

Seahorse's Sea Slide and PSI Marine's TideSlide already operate in the same market. Both companies describe their products as mooring products, and both sell them to the same

17

general class of boat owners. Seahorse claims that PSI Marine cannot legally bridge the gap because Seahorse owns patents on its Flex Slide and Tide Right products. Def.'s Mem. 22. But owning a patent on a product does not eliminate all competition with that product. Seahorse's Flex Slide and Tide Right products, despite being patented, compete in the same marketplace. In any event, because I have already resolved the proximity factor in PSI Marine's favor, the bridging factor is irrelevant. *See Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005).

### 5.    Actual Confusion

The next *Polaroid* factor looks to whether consumers have actually been confused about the source of the products that bear the allegedly confusing marks.

"[T]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 589 (S.D.N.Y. 2015); *see also Savin Corp*, 391 F.3d at 459 (2d Cir. 2004) (same)*.* Accordingly, "courts have concluded that the absence of such evidence may favor the junior user." *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 319 (S.D.N.Y.), *aff'd sub nom. Paco Sport, Ltd. v Paco Rabanne Perfumes*, 234 F.3d 1262 (2d Cir. 2000). "Evidence of actual confusion may consist of anecdotal or survey evidence." *Id.* Although a finding of actual confusion would strongly militate in favor of a finding of likelihood of confusion, "[i]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act." *Savin Corp.*, 391 F.3d at 459 (citation and internal quotation marks omitted).

The parties both argue by reference to a survey of likely customers produced by PSI Marine's trademark expert. Keegan Dep., ECF No. 97-7. The survey looked at the likelihood of confusion between TIDESLIDE and Seahorse's three allegedly infringing marks. PSI

Marine urges me to look at all the marks conjointly, and find that together, they demonstrate evidence of actual confusion. However, as I already concluded that I must consider the trademarks individually rather than conjointly, I will consider the net confusion numbers of each of the three Seahorse products independently.

The net confusion is the difference in confusion between PSI Marine's TideSlide product and Seahorse's product names versus the controls and PSI Marine's product names.[9] *Id.* ¶ 23. "Plaintiffs[] admit that the 'SlideMoor' product name does not infringe Plaintiffs' TIDESLIDE trademark and Plaintiffs' trademark survey expert used SlideMoor in his survey as a non-infringing product for one of the survey control cells." *Id.* The net confusion numbers were: 7.5% aggregated across all three marks; 13.1% for the Sea Slide Product, 5.7% for the Tide Right product; and .3% for the Flex Slide product. Keegan Dep. 115: 20-24, ECF No. 97-7, at 32. Def.'s L.R. 56(a)2 St. ¶ 63; Def.'s Mem. 17-22.[10] "Trademark survey experts rely on the net confusion numbers to show confusion caused by the trademark over the baseline confusion in the marketplace." Def.'s L.R. 56(a)2 St. *Id.* ¶ 14. "Baseline confusion reflects

---

[9] The parties dispute whether confusion turns on the "overall confusion," which is the total level of confusion between each of three different Seahorse products and the TIDESLIDE trademark, or the "net confusion," which is the difference in confusion between PSI Marine's TideSlide product and Seahorse's product names versus the controls and PSI Marine's product names. *Id.* ¶ 23. Although PSI Marine urges me to focus on "overall confusion," its own expert confirmed that net confusion is the appropriate metric. PSI Marine's expert states that reliance on overall confusion is incorrect. As PSI Marine acknowledges, "[t]he level of confusion caused by the accused product names was measured and is reflected by the net confusion numbers presented in the survey results." Pls.' L.R. 56(a)2 St. ¶ 13.

[10] The net confusion across all three marks was calculated by aggregating the responses from each of the three different Seahorse products. The net confusion across all three products, 7.5%, is higher than the mean of the three net confusion numbers, 6.36%, because more data was collected for the Sea Slide product. The aggregate number was a weighted average that was higher than the raw mean of the three different levels of net confusion. Keegan Dep. 116-119, ECF No. 97-7, at 32-33.

confusion that exists in the marketplace that is not attributable to the accused product names." *Id.* ¶ 15.

Notably, PSI Marine's expert has opined in other cases "that no likelihood of confusion exists when trademark survey results show less than 15% net confusion." *Id.* ¶ 21. Indeed, courts have relied on likelihood of confusion surveys as evidence of actual confusion, and at times viewed 15% as an important threshold. *See, e.g.*, *Kind LLC v. Clif Bar & Co.*, No. 14 CIV. 770 KMW RLE, 2014 WL 2619817, at * 9 (S.D.N.Y. June 12, 2014) (collecting cases in support of the view that "case law indicates that a 15% net confusion rate may be sufficient to show actual confusion").

In addition to the survey results, PSI Marine has cited anecdotal evidence that some consumers have actually confused the parties' products. Moran, the original owner of Seahorse Fender & Docking, when asked whether customers would confuse the names TideSlide with Tide Right and Flex Slide products, responded, "they're confused on what the product is and then putting the names together with the product." Moran Dep. 150: 22-23, ECF No. 98-5, at 2. Past purchasers have emailed Seahorse about Seahorse products but referred to them as "Tide slides." Def.'s L.R. 56(a)2 St. ¶ 59. Seahorse argues these references to "tide slides" should not carry much weight because customers used two words and did not write them as "TideSlides," the official brand name. Def.'s Mem. 21. However, no ordinary, lay customer could be expected to appreciate the difference between "tide slides" and "TideSlides." It appears that at least some customers conflated the TideSlides sold by PSI Marine with the mooring products sold by Seahorse.

In sum, the survey evidence shows a substantial amount of net confusion for the Sea Slide product (13.1%), less for the Tide Right product (5.7%), and a very small rate for Flex

Sides (.3%). In addition, there are multiple instances in which customers referred to Seahorse products as "tide slides." Some of this confusion occurred during a time period when Seahorse Fender & Docking sold only Tide Right and Flex Slide products, so the confusion at that point cannot be attributed to confusion over the Sea Slide product, which was introduced later in time. Moran Dep. 150-52, ECF No. 98-5, at 2.

Thus, evidence of actual confusion is strongest with respect to Sea Slide, weakest for Flex Slide, and in the middle for Tide Right. With respect to the Sea Slide and Tide Right products, both survey evidence and anecdotal evidence point to some actual confusion. As for Flex Slide, although the survey results point to a lack of confusion, the anecdotal evidence does suggest that consumers called Seahorse Fender & Docking products "tide slides" during a time period when Seahorse Fender & Docking was selling only Flex Slide and Tide Right products.

I conclude that no reasonable juror could find that this factor favors PSI Marine with respect to the Flex Slide product. Therefore, I conclude as a matter of law that this factor favors Seahorse as to Flex Slide. However, regarding the Sea Slide and Tide Right products, reasonable jurors could reach differing conclusions depending on the inferences drawn and the weight placed on different pieces of evidence. *See Akiro LLC*, 946 F. Supp. 2d at 339 ("The parties have thus presented conflicting evidence of actual consumer confusion, and ask the Court to draw conflicting inferences and give different degrees of weight to different pieces of that evidence. Once again, whether one view the evidence favorable to plaintiff or to defendant makes all the difference."). Therefore, a reasonable juror could conclude this factor weighs in favor of either party as to the Sea Slide and Tide Right products.

### 6.    Good Faith

This next factor "examines whether defendant[ ] adopted [its] mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [its] and plaintiff's product." *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998) (internal quotation marks, alterations and citation omitted). "Prior knowledge of a senior user's trade mark does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Arrow Fastener Co.*, 59 F.3d at 397 (citation omitted). Indeed, "the intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product." *Nora Beverages, Inc. v. Perrier Grp. of Am.*, Inc., 269 F.3d 114, 124 (2d Cir. 2001) (internal quotation marks and citations omitted); *see also George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1541 (2d Cir. 1992) ("There is an essential distinction . . . between a deliberate attempt to deceive and a deliberate attempt to compete. Absent confusion, imitation of certain successful features in another's product is not unlawful and to that extent a 'free ride' is permitted."). Thus, "the only relevant intent is intent to confuse." *Starbucks Corp.*, 588 F.3d at 117 (internal quotation marks and citation omitted).

It is undisputed that Carmen Martocchio, the owner of Seahorse, hired Kropp, a mechanical engineer, to create a product model of the TideSlide. Def.'s L.R. 56(a)2 St. ¶ 15. Martocchio then entered the marine product manufacturing business specifically because of the TideSlide product. PSI Marine claims Martocchio wished to manufacture the same product, while Seahorse instead claims that Martocchio wanted to improve upon the product. *Id*. ¶ 15-16. Either way, the decision to name the subsequent product Sea Slide was made after the product's dimensional drawings were named with TIDESLIDE in the title. *Id.* ¶ 50.

22

Furthermore, Seahorse identified items on the company's inventory list using the words "Tide Slide." *Id.* ¶ 57. Then Seahorse picked a name, SEA SLIDE, that bears more than a passing similarity to TIDESLIDE for its product based off of the TideSlide models. Yet all of the evidence above is merely circumstantial. The case law makes clear that prior knowledge is not in and of itself bad faith, and that imitation is vastly different from the intent to deceive. I conclude it is a disputed issue of fact as to whether Seahorse's use of SEA SLIDE was in bad faith.

Moreover, it is undisputed that Sea Slide, Tide Right, and Flex Slide were marketed together, at least to a degree. They were all sold together on the same website. Def.'s L.R. 56(a)(2) St. ¶ 64. Seahorse advertised all three products on social media, including multiple products within a single advertisement. *Id.* ¶¶ 65, 67. In its booths at boat shows Seahorse set up simulations of its various products. *Id.* ¶ 69. PSI Marine argues that Seahorse purchased the TIDE RIGHT and FLEX SLIDE marks, then created the SEA SLIDE mark, to capitalize on the confusion with the TIDESLIDE trademark. Pls.' Mem. 19. Unresolved questions remain why Martocchio purchased TIDE RIGHT and FLEX SLIDE, and the degree to which, if at all, he wanted to capitalize on selling them alongside a product, SEA SLIDE, whose name might particularly confuse customers. *See* Def.'s L.R. 56(a)(2) St. ¶¶ 16-17. Thus, I conclude there are disputed issues of fact as to whether Seahorse used TIDE RIGHT and FLEX SLIDE in connection with SEA SLIDE in a manner designed to capitalize on the TIDESLIDE mark's good will.

Accordingly, although the evidence is strongest for the Sea Slide product, I conclude that, as to all three marks, it is a disputed issue of material fact whether Seahorse acted in bad faith and intended to infringe upon PSI Marine's TIDESLIDE trademark. *See Sports Auth.,*

23

*Inc. v. Prime Hosp. Corp.*, 89 F.3d 955. 964 (2d Cir. 1996) ("Taken as a whole, the evidence does not conclusively point to a finding of either good or bad faith, and this issue, like many intent issues, is best left in the hands of the trier of fact."); *see also Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 483 (2d Cir. 1996) ("[R]ecognizing that subjective issues such as good faith are singularly inappropriate for determination on summary judgment, we decline to hold as a matter of law that the defendants have acted in bad faith.") (internal quotation marks and citation omitted). Seahorse's intent is therefore a disputed fact reserved for the jury such that this factor cannot be resolved as a matter of law in favor of either party as to any of the marks.

### 7.    Quality of the Products

The Second Circuit has observed that the next factor, the quality of the products, "is the subject of some confusion." *Savin Corp.*, 391 F.3d at 460. The Court has explained:

> Essentially, there are two issues with regard to quality, but only one has relevance to determining the likelihood of confusion. If the quality of the junior user's product is low relative to the senior user's, then this increases the chance of actual injury where there is confusion, i.e., through dilution of the senior user's brand. A marked difference in quality, however, actually tends to reduce the likelihood of confusion in the first instance, because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user. Conversely, where the junior user's products are of approximately the same quality as the senior user's, there is a greater likelihood of confusion, but less possibility of dilution.

*Id.* at 460-61 (internal quotation marks and citations omitted). *See also Lois Sportswear, U.S.A., Inc.*, 799 F.2d at 875 (finding an increase in the likelihood of confusion as to source where the junior user's product was of good quality).

Here, in Seahorse's own words, "there is no evidence . . . that the quality of the Tide Right and Flex Slide products are inferior in quality to that of the Plaintiff's TideSlide

product." Def.'s Mem. 23. Accordingly, this factor, viewed in the light most favorable to Seahorse, actually counsels in favor of PSI Marine. PSI Marine's arguments that Seahorse fails to correct customers who refer to damaged products as "tide slides" goes to dilution and is not relevant for the question at this stage, the likelihood of confusion. Pls.' Mem. 21. Thus, the similarity in the quality of the products sold by both PSI Marine and Seahorse supports a finding of confusion. I conclude as a matter of law that this factor favors PSI Marine with respect to all marks.

### 8.    Sophistication of Relevant Customers

The final factor assesses the sophistication of the consumers of the products and the degree of discrimination they exercise when purchasing the products. "[T]he more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace." *Savin Corp.*, 391 F.3d at 461. Seahorse contends that the relevant customers of its own and the Tideslide products are sophisticated because all relevant products cost more than $500 and customers generally purchase more than one unit at a time. Def.'s Mem. 11. PSI Marine does not contest this factor, urging a finding of actual confusion because "the mere identification of the general customer's sophistication . . . is not the aim of the analysis." Pls.' Mem. 15. Therefore, I conclude that this factor favors Seahorse as to all of the marks.

### 9.    Weighing of the *Polaroid* Factors

Summary judgment as to likelihood of confusion is appropriate where "the undisputed evidence would lead only to one conclusion under the *Polaroid* test." *Sports Auth., Inc.*, 89 F.3d at 960 (internal quotation marks and citation omitted). If I cannot weigh the *Polaroid* factors decidedly in favor of either party, I am precluded from granting summary judgment in

either party's favor as to trademark infringement. *See Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 178 (S.D.N.Y. 2022) ("Viewed in combination, the *Polaroid* factors do not decisively favor either party as to the ultimate question of whether consumers of pouched juice drinks would likely be confused. . . . All in, the factors tip in Capri Sun's favor, but slightly, with the important qualification that, depending on the light in which the evidence as to various factors is viewed, the balance can be viewed as favoring Capri Sun more decisively, or as tipping in ABC's favor."); *see also Lion-Aire Corp. v. Lion Air Installation, Inc.*, 747 F. Supp. 3d 488, 514 (E.D.N.Y. 2024) (denying cross motions for summary judgment where "two of the Polaroid Factors weigh in favor of Plaintiff, one factor weighs in favor of Defendants, three factors either weigh in favor of Plaintiff or are neutral, and the remaining two factors could weigh in favor of either party, depending on the weight of the evidence"); *see also Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 515 F. Supp. 3d 47, 76 (S.D.N.Y. 2021) (denying summary judgment where two *Polaroid* factors weighed in favor of one party, and the other factors weighed in favor of the other party or were neutral).

As I explain, the *Polaroid* factors that can be resolved from this record do not so clearly favor one party as to permit judgment as a matter of law. For the Sea Slide product, factors one and three favor PSI Marine, which makes factor four irrelevant. Factor seven also favors PSI Marine. Factor eight favors Seahorse. *Polaroid* factors two, five, and six can be resolved only by reference to disputed issues of fact. Because the evidence does not lead to only one conclusion, I cannot determine as a matter of law that Seahorse's SEA SLIDE mark infringed upon PSI Marine's TIDESLIDE trademark.

For the Tide Right product, factors one, three, and seven favor PSI Marine. Factor four is irrelevant. Factor eight favors Seahorse. Factors two, five, and six cannot be resolved at this

juncture. Because the evidence does not lead to only one conclusion, there are genuine issues of material fact regarding whether Seahorse's TIDE RIGHT mark infringed upon PSI Marine's TIDESLIDE trademark.

For the Flex Slide product, factors one, three, and seven favor PSI Marine. Factor four is irrelevant. Factors five and eight favor Seahorse. Factors two and six cannot be resolved at this stage. Although the lack of survey evidence of actual confusion makes it a close call, I cannot rule out the possibility that a reasonable jury could find in favor of PSI Marine. Thus, there are genuine issues of material fact regarding whether Seahorse's FLEX SLIDE mark infringed upon PSI Marine's TIDESLIDE trademark.

Accordingly, summary judgment is denied for both parties as to Counts II, III, V, and VI, and denied for PSI Marine as to Counts I and IV.

### B.    Counts VII and VII, False Advertising

Both Counts VII and VIII allege Seahorse engaged in false advertising about its Tide Right product in violation of 15 U.S.C. § 1125(a)(1)(B). Am. Compl. 16, 17. Count VII alleges that Seahorse's advertisement of its Tide Right product as "[a]n adjustable Self Level Docking System with an engineered and patented self-adjusting fender and cleat" is false because Seahorse has not patented a cleat. Def.'s L.R. 56(a)2 St. ¶ 32; Pls.' Mem. 31. Count VIII alleges that the "Tide Right" product is not "the only adjustable Self-Leveling Docking System" and therefore Seahorse's advertisement of the product as the *only* such one is false. Am. Compl. 17; ECF No. 1-4 (advertisement). Both parties have moved for summary judgment on Count VII, while Seahorse alone has moved for summary judgment on Count VIII.

"A claim of false advertising may be based on at least one of two theories: 'that the challenged advertisement is literally false, i.e., false on its face,' or 'that the advertisement,

while not literally false, is nevertheless likely to mislead or confuse consumers.'" *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 112 (2d Cir. 2010) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007)). Additionally, a plaintiff must prove that the challenged advertisement is "the cause of actual or likely injury to the plaintiff." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016) (citing *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255-56 (2d Cir. 2014)). "[W]here the statement at issue is not literally false, however, a plaintiff 'must demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers,' and must 'demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement.'" *Tiffany (NJ) Inc.*, 600 F.3d at 112-113.

PSI Marine has not offered extrinsic evidence that the Seahorse advertisements have misled or confused customers and so must rely solely upon the theory that Seahorse's statements are literally false. Pls.' Mem. 16-26. "Where an advertising claim is literally false, the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public." *Tiffany (NJ) Inc.*, 600 F.3d at 112. I examine the two allegedly literally false advertisements separately.

### 1.    Count VII: "Patented Self-Adjusting Fender and Cleat"

The parties cross move for summary judgment on Count VII. According to PSI Marine, Seahorse's advertisement that "the Seahorse docking Tide Right includes an engineered and patented self-adjusting fender and cleat" is literally false because the patents for the Tide Right product do not contain claims covering a cleat. Pls.' Mem. 32. PSI Marine also asserts that summary judgment should be granted in its favor because the legal entity Seahorse does not

own the patents in question that apply to the Tide Right product. Pls.' Opp. 23. Seahorse argues that summary judgment should be granted in its favor because its advertising claims are demonstrably true and accurate. Def.'s Mem. 24. In particular, Seahorse claims that its Tide Right product is the subject of patents owned by Seahorse. *Id.* at 25.

Michael Moran, from whom Seahorse purchased the assets of Seahorse Fender and Docking, registered two patents U.S. Patent No. 9,302,750 ("the '750 Patent") and U.S. Patent No. 9,556,575 ("the '575 Patent"). Def.'s L.R. 56(a)2 St. ¶¶ 23, 26; ECF Nos. 97-14, 97-15. Moran believes both cover the TIDE RIGHT product. Def.'s L.R. 56(a)2 St. ¶¶ 23, 26. According to PSI Marine, Moran's sale of the assets of Seahorse Fender & Docking to Trident Marine Products, LLC (which then got renamed Seahorse) did not include the '750 patent or the '575 Patent. Def.'s L.R. 56(a)2 St. ¶ 38. Seahorse disputes this and asserts that it does in fact own the patents subject to an agreement recorded after the purchase of Seahorse Fender and Docking's assets. Def.'s Reply. 9.

Even assuming that Seahorse does not own the '750 and '575 patents, this fact would not render the advertisement in question false on its face. The advertisement does not say that Seahorse owns the patent on the Tide Right product, only that Tide Right "includes an engineered and patented self-adjusting fender and cleat." *Id.* ¶ 32. Whether the statements are literally false then depends not on who owns the patent, but whether the product in question is actually the subject of a patent.

PSI Marine does not dispute that the patents cover a self-adjusting fender. Pls.' Mem. PSI Marine asserts, however, that the patents in question, '750 and '575, do not include any claims covering a cleat. *Id.* at 30. One can read the phrase "patented self-adjusting fender and cleat" in several ways. There are two adjectives, "patented" and "self-adjusting", and two

29

nouns, "fender" and "cleat", separated by the word "and". The two adjectives, on the literal face of the statement, could be taken to modify only the first noun, "fender", not "cleat." Seahorse observes that the Tide Right product does in fact include an optional cleat, reflected in the '750 patent drawings and description, even if a cleat is not covered by one of the claims of the patent. ECF No. 97-14, at 5, 9, 12, 13. Therefore, under the interpretation that patented and self-adjusting modify only fender, it is not false on its face to say that the Tide Right product includes a "patented" fender nor to say the product includes a cleat.

One could also read the phrase "patented self-adjusting fender and cleat" to have both adjectives modify the entire phrase "fender and cleat" that are a shorthand description of the Tide Right product. For example, I might talk of a "deadly and accurate bow and arrow", but neither the bow nor the arrow on their own can really be deadly, nor accurate. Rather, the adjectives "deadly" and "accurate" modify the unit as a whole of the bow and arrow. It is not false on its face to say a "deadly and accurate bow and arrow" even though an arrow without a bow cannot be accurate.

Just so with "patented self-adjusting fender and cleat." Seahorse uses two nouns, "fender" and "cleat" as a shorthand way to describe the Tide Right product. Just because the cleat may not be patented itself does not mean the statement is false face when the Tide Right product as a whole is the subject of patents and the product itself does include a cleat.

To be sure, the advertisement may be confusing. A reasonable juror could conclude that the phrase "includes an engineered and patented self-adjusting fender and cleat" may confuse or even mislead customers into thinking that Seahorse owns patents that include claims over the cleat. However, the fact that someone might read the advertisement this way does not make the statement "literally false." *Tiffany (NJ) Inc.*, 600 F.3d at 112. If PSI Marine wants to

30

maintain a false advertising claim for an advertisement that is not literally false but merely misleads customers, it is required to "'demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers,' and must 'demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement.'" *Id.* at 112-13. Since PSI Marine has submitted no such extrinsic or statistical evidence, I conclude as a matter of law that PSI Marine cannot prevail on Count VII. Therefore, I grant summary judgment in favor of Seahorse on Count VII.

### 2. Count VIII: "The Only Adjustable Self-Leveling Docking System"

Count VIII alleges Seahorse falsely advertised when it described its Tide Right product as "the only adjustable Self-Leveling Docking System." Pls.' L.R. 56(a)2 St. ¶ 46. PSI Marine argues that this claim is literally false because there are other adjustable self-leveling docking systems. Pls.' Opp. 24-25. Only Seahorse has moved for summary judgment on this count, arguing that PSI Marine has identified no other product that matches the description in the advertisement.

PSI Marine maintains that its own TideSlide is a self-adjusting tidal mooring device. Pls.' Opp. 24-25. Mark Baluha, inventor of TideSlide, obtained U.S. Patent 6,216,625 ("625 Patent") titled "Self Adjusting Tidal Mooring Device." ECF No. 108-24, at 2. Seahorse claims that TideSlide is not actually self-leveling because it "does not have any floats and therefore does not 'self-level' when no boat is tied up to the product." Def.'s Reply. 6; *see also* Def.'s L.R. 56(a)(2) St. ¶ 4 ("PSI Marine's TIDESLIDE product is not 'self-adjusting' because it does not have self-leveling floats and depends on being tied up to a boat to adjust up and down."). Yet Patent '625 conferred upon Baluha for the TideSlide, states that "[a]s tidal

31

motions or water *levels* act on the vessel the vertical slide block is allowed to freely move up and down on the vertical slide shaft, while maintaining spacial [sic] position of the craft in the mooring slip." ECF No. 108-24, at 2. From this description, it would appear that TideSlide self-adjusts to match the level of the vessel.

A reasonable juror could well conclude that Patent '625 describes a self-leveling, adjustable docking system, which, if true, would make Seahorse's advertisement that the Tide Right was the only such product false on its face. However, there may be competing definitions of "adjustable" and "self-leveling" that would allow Seahorse to defeat the false advertising claim and show its product is, indeed, the only adjustable self-leveling docking system. I cannot conclude as a matter of law that Seahorse's definition should prevail. Accordingly, I conclude that there is a genuine issue of material fact regarding the literal falsity of Seahorse's advertisement and deny summary judgment to Seahorse on Count VIII.

### C.    Equitable Defenses

Seahorse asserts various equitable defenses against PSI Marine's claims with respect to Seahorse's Tide Right and Flex Slide products. Specifically, Seahorse argues summary judgment should be granted in its favor for Counts II, V, VII, and VIII because of laches, for Counts II, III, V, and VI because of equitable estoppel, and for Counts II and V because of acquiescence. Def.'s Mem. 30, 33, 36. PSI Marine argues that Seahorse cannot assert equitable defenses because Seahorse has unclean hands, and, in any event, I should deny the equitable defenses at this stage because Seahorse cannot establish the necessary elements of each defense. Pls.' Opp. 28.

As an initial matter, I address PSI Marine's contention that Seahorse's unclean hands bars invocation of its equitable defenses. It is well established that "he who comes into equity

must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). To be sure,

> [t]his maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith . . . . Thus while equity does not demand that its suitors shall have led blameless lives, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.

*Id.* at 814-15 (internal quotation marks and citations omitted). Thus, a court may deny relief based on the unclean hands doctrine "where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F.Supp.2d 126, 131 (S.D.N.Y. 1999) (internal quotation marks and citation omitted).

In evaluating whether the unclean hands doctrine applies, "what is material is not that the [defendant's] hands are dirty, but that [it] dirtied them in acquiring the right [it] now asserts." *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 13 F.Supp.2d 430, 445 (S.D.N.Y. 1998) (internal quotation marks and citation omitted); *see also Yurman Design, Inc. v. Golden Treasure Imports, Inc.*, 275 F. Supp. 2d 506, 518 (S.D.N.Y. 2003) (citing *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 13 F. Supp. 2d 430, 445 (S.D.N.Y. 1998) ("Unclean hands must relate to the getting or using the alleged trademark rights."). "The burden of proving that unclean hands bars equitable relief is on the party asserting the defense." *Pedinol Pharmacal, Inc. v. Rising Pharm., Inc.*, 570 F.Supp.2d 498, 505 (E.D.N.Y. 2008) (citation omitted).

Application of the unclean hands doctrine rests in the discretion of the court, which is "not bound by formula or restrained by any limitation that tends to trammel the free and just

exercise of discretion." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245–46 (1933).

> In the context of a suit such as this, sounding in infringement,
>
> [i]t is well established that laches is not a defense . . . when the defendant intended the infringement. This good-faith component of the laches doctrine is part of the fundamental principle that he who comes into equity must come with clean hands. Thus, . . . intentional infringement is a dispositive, threshold inquiry that bars further consideration of the laches defense.

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000) (patent infringement case) (internal quotation marks and citations omitted).

Here, in viewing the record in the light most favorable to PSI Marine, I have already determined that material questions of fact exist as to whether Seahorse's SEA SLIDE name intentionally infringed on PSI Marine's TIDESLIDE mark. It follows that whether Seahorse may maintain its equitable defenses, in light of its potentially dirty hands, is a question to be resolved another day. *See Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F.Supp.2d 247, 273 (S.D.N.Y. 2002) ("[B]ecause a material issue of fact exists as to whether intentional infringement occurred . . . . [Defendant] may not prevail on its equitable defenses in summary judgment, because it may not be permitted to raise them at all."). Accordingly, Seahorse may not prevail on summary judgment of its equitable defenses, based on the unclean hands doctrine. *See also CSL Silicones, Inc. v. Midsun Grp. Inc.*, 301 F. Supp. 3d 328, 364 (D. Conn. 2018) (holding summary judgment on equitable defenses unwarranted where there was a material dispute on intentional infringement).

Seahorse argues that potential intentional infringement by its Sea Slide product is irrelevant to equitable defenses asserted against the Counts that allege infringement by Seahorse's Tide Right and Flex Slide products. Def.'s Reply. 11.

However, the clean hands doctrine encompasses the scope of the litigation and alleged injury that resulted from any misconduct. "[W]hile equity does not demand that its suitors shall have led blameless lives as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, (1945) (internal quotation marks and citations omitted). "Courts apply the maxim requiring clean hands where the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine." *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 494 (2d Cir. 2004) (internal quotations omitted). The "subject matter in litigation" is PSI Marine's TIDESLIDE trademark. *Id.* Material questions of fact remain whether Seahorse has injured PSI Marine by intentionally infringing upon that mark with use selection of the SEA SLIDE trademark.

Furthermore, questions of fact remain as to the degree to which Seahorse advertised and sold its Flex Slide and Tide Right products alongside its Sea Slide products to potentially profit from the confusion with PSI Marine's TideSlide product. It is undisputed that Sea Slide, Tide Right, and Flex Slide were all sold together on the same website. Def.'s L.R. 56(a)(2) St. ¶ 64. Seahorse sometimes advertised all three products on social media, including multiple products within a single advertisement. *Id.* ¶¶ 65, 68. At its booths at boat shows Seahorse set up simulations of its various products. *Id.* ¶ 69. It is disputed, however, whether the marks are likely to confuse in the first place, whether Seahorse's SEA SLIDE intentionally infringed upon PSI Marine's trademark, and whether Seahorse used FLEX SLIDE and TIDE RIGHT along with SEA SLIDE in a manner designed to capitalize on confusion between SEA SLIDE and TIDESLIDE. At this stage of the litigation, too many unresolved issues of fact, and

inferences to draw from the facts, remain to determine how collateral the TIDE RIGHT and FLEX SLIDE trademarks are to Seahorse's allegedly unclean hands. *See Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999) ("The alleged unclean hands must relate to [the defendant's] acquisition or use of the Saporiti trademark, and does not apply to issues which are collateral to the infringement litigation.").

Whether Seahorse has actually intentionally infringed upon PSI Marine's trademark remains an unsettled question, and so although Seahorse may not prevail upon its equitable defenses at the summary judgment stage, it may raise these defenses again pending the determination of the intentional infringement question at trial.

### D.    Count IX Copyright Claims

Both parties have moved for summary judgment on Count IX, which alleges that Seahorse infringed on PSI Marine's copyright for its TideSlide Price Guide. Seahorse argues that there is no evidence it literally copied PSI Marine's TideSlide Price Guide, and, even if it did, the elements it borrowed do not merit copyright protection. Def.'s Mem. 27.

"To establish a claim of copyright infringement, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 66 (2d Cir. 2020) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). It is undisputed that Baluha owns a registered copyright in the TideSlide Price Guide 2022. Pls.' L.R. 56(a)2 St. ¶ 78. Accordingly, I move to the second element, copying.

To succeed on an action for copyright infringement, PSI Marine must show that Seahorse (1) "actually copied its original protected work and (2) the copying was illegal because substantial similarity existed between the Defendants' work and the protectable

36

elements of the Plaintiffs' work." *LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 606 (D. Conn. 2019). Because I find a reasonable jury would have to conclude that Seahorse copied large elements of PSI Marine's Price Guide, the crux of the legal argument in Count IX comes down to whether the copied elements were protectable under copyright law.

### 1.    Actual copying

Actual copying may be established "either by direct evidence of copying or by indirect evidence." *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992). PSI Marine does not offer direct evidence that Seahorse copied the pricing brochure. Pls.' Mem. 25-26. Indeed, Seahorse contends that its office manager, Courtney Cuison, created the Seahorse Price list and observes that she stated in her deposition that she did not have PSI Marine's Brochure and Price guide in front of her when she did so. Def.'s Mem. 39.

Without direct evidence, PSI must rely on circumstantial evidence to prove actual copying. "A plaintiff may establish actual copying circumstantially by demonstrating (a) that the defendant had access to the copyrighted material and (b) that the two works exhibit similarities probative of copying." *Muller v. Anderson*, 501 F. App'x 81, 83 (2d Cir. 2012) (internal quotation marks omitted). PSI Marine argues that "Seahorse had at least a reasonable possibility of access to the TIDESLIDE price guide." Pls.' Mem. 25. "Access means that an alleged infringer had a 'reasonable possibility'—not simply a 'bare possibility'—of hearing the prior work; access cannot be based on mere 'speculation or conjecture.'" *Jorgensen v. Epic/Sony Recs.*, 351 F.3d 46, 51 (2d Cir. 2003) (quoting *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir.1988). Anthony Martocchio, Seahorse's head of sales and marketing, attended the Fort Lauderdale Boat Show at which hard copies of the TideSlide Price Guide were published, and at least one digital copy of the TideSlide website (including the Price Guide)

was saved by Seahorse. Def.'s L.R. 56(a)2 St. ¶¶ 79-82. It is undisputed, therefore, that Seahorse had at least a reasonable possibility of access to the TideSlide Price Guide.

I next examine similarities probative of copying. Probative similarity is a "less demanding test than" substantial similarity and requires "only that there are similarities between the two works that would not be expected to arise if the works had been independently created." *Michael Grecco Prods., Inc. v. Valuewalk*, LLC, 345 F. Supp. 3d 482, 500 (S.D.N.Y. 2018) (internal quotation marks and citation omitted).

There is no doubt that there are probative similarities that would not be expected to arise from independent creation. PSI Marine's Price Guide is arranged in a table, with seven different boat classes making up the elements of the vertical, Y axis. Each class has a minimum size and weight of boat, as well as sizing information for the type of steel shafts used for the actual slides sold by PSI Marine. ECF No. 97-19. The horizontal X-axis then has columns marked by shaft length, running from "4 feet" to "12 feet." Across the first five rows of Seahorse's pricing chart, the numbers for the size and weight of the boats and the width of the steel shafts are nearly identical to those in PSI Marine's. ECF No. 97-20. For example, the top row, in PSI Marine's Price Guide, is "For Boats to 30 feet or 12,000 lbs" and ("1' Solid 316L SS shaft"), while for Seahorse it is "Boats up to 30 feet or 12,000lbs" and "Solid 1'" 316SS shaft." ECF Nos. 97-19, 97-20. The second row of PSI Marine's Price Guide reads "For Boats 25-38 feet or 9-20,000lbs" and ("1 1/4" Solid 316LSS Shaft") while Seahorse's says "Boats up to 38 feet or 20,000lbs) and "Solid 1 1/4" 316 SS shaft." *Id.* The three rows below continue the trend, and the columns in both price guides run from 4 feet to 12 feet, with the only difference being that PSI Marine does not have a column for 11 feet. With so many identical

numbers, no reasonable jury could conclude that Seahorse's price guide does not exhibit at least probative similarities to PSI Marine's.

Since no reasonable jury could additionally deny that Seahorse had a reasonably possibility of access to Seahorse's price chart, I conclude as a matter of law that Seahorse actually copied PSI Marine's TideSlide Price Guide 2022.

### 2.    Substantial Similarity between Protectable Elements of Works

"It is not enough, however," that Seahorse "actually copied" PSI Marine's Price Guide. *LEGO A/S*, 404 F. Supp. 3d at 608. PSI Marine "must also show" that Seahorse's "copying was improper." *Id*. This requirement recognizes that "[p]arrotry does not always mean piracy"; to succeed, a plaintiff alleging infringement "must also show illegality, and this requires a sharper focus: the court must find a substantial similarity between the *protectible* elements of the two works." *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994) (emphasis in original).

Here, as discussed above, it is indisputable that Seahorse did copy substantial portions of the pricing chart, namely, in Seahorse's own words, "factual information reflecting various boat size categories . . . factual information describing the size and type of steel used for the slides . . . and that the price list is organized in the same basic spreadsheet format." Def.'s Mem. 41. The question then remaining is whether the factual information chart copied by Seahorse was protectable under copyright. To this charge, Seahorse raises two principal defenses, that (a) Seahorse made fair use of this factual information, and (b) that Seahorse did not copy protectable elements of PSI Marine's Price Guide. Def.'s Mem. 38, 46. In response, PSI Marine argues that commercial use of the copied information is not fair use and that factual elements can be protectable. Pls.' Mem. 25.

### a.    Fair Use

The Copyright "Act also allows for certain 'fair' uses of copyrighted works." *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 178 (2d Cir. 2024) (citing 17 U.S.C. § 107). The statute sets out four non-exclusive factors for courts to consider in determining whether a particular use is "fair": "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *See id.* at 178-79. I examine each factor in turn.

### i.    The purpose and character of the use

The first fair use factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). "In assessing the first factor, courts consider two sub-factors: (i) the extent to which the secondary use is transformative and (ii) whether the secondary use is commercial in nature." *Hachette Book Grp.*, 115 F.4th at 179. It is undisputed that Seahorse has used its pricing chart for commercial purposes.

The use of a work to achieve "a purpose that is the same as, or highly similar to, that of the original" is more likely to substitute or supplant the original work, and less likely to be considered transformative. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023). Here, Seahorse is using the price chart for the same purpose as PSI Marine, selling mooring products. This factor weighs heavily against Seahorse's fair use of the information in the pricing chart.

### ii.    The Nature of the Copyrighted Works

The second fair use factor is "the nature of the copyrighted work." 17 U.S.C. § 107(2). In assessing the second factor, courts consider (i) whether the work is expressive or creative, with "greater leeway being allowed to a claim of fair use where the work is factual or informational"; and (ii) "whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006). The factual information at dispute here is hardly expressive or creative, so this factor weighs in favor of Seahorse. However, this factor "rarely play[s] a significant role in the determination of a fair use dispute." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015).

### iii.    The Amount and Substantiality of the Use

The third fair use factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Generally, a finding of fair use is more likely when "small amounts, or less important passages [of the work] are copied than when the copying is extensive, or encompasses the most important parts of the original." *Google Books*, 804 F.3d at 221. Here, Seahorse has copied many of the most important details for a sales chart. Seahorse has used essentially the exact same technical definitions of the different product models, as well as the same overall spread sheet layout. *See* ECF Nos. 97-19, 97-20.

On the other hand, beyond some of the literal elements, courts must examine the works' "total concept and feel." *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1003 (2d Cir. 1995). Here, the inquiry becomes much more ambiguous. Although Seahorse borrowed the spreadsheet format and the factual information, it replicated almost none of the stylistic or

artistic choices employed by PSI Marine. The guides have different color schemes, and PSI Marine employs a heavily branded banner at the top of its price guide that is absent from Seahorse's. In addition, PSI Marine uses names such as "Heavy Duty Class" to describe its products meant "For boats to 30 feet or 12,000lbs" while Seahorse skips the name and simply copies the more pared back and functional description "Boats up to 30 feet or 12,000lbs." *See* ECF Nos. 97-19, 97-20. Most importantly, the third and fourth factors are interrelated, as the greater the amount and substantiality of the use, "the greater the likelihood that the secondary work might serve as an effectively competing substitute for the original." *Google Books*, 804 F.3d at 221.

### iv. The effect of the use on the potential market for or value of the works

The fourth and final fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy [rather than] the original." *Google Books*, 804 F.3d at 223. "The fourth factor is 'undoubtedly the single most important element of fair use.' *Hachette Book Grp., Inc.*, 115 F.4th at 189 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985)).

We ask not "whether the second work would damage the market for the first (by, for example, devaluing it through parody or criticism), but whether it usurps the market for the first by offering a competing substitute." *Andy Warhol Foundation for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 48 (2d Cir. 2021). Seahorse makes much of the fact that "neither party

is commercializing or earning money directly from its price sheets" since neither PSI Marine nor Seahorse sells the brochures themselves. Def.'s Mem. 46 (citing *Authors Guild*, 804 F. 3d at 223 ("The fourth fair use factor . . . focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original.")). Although PSI Marine may not be selling the Price Guide itself, the Guide clearly serves the ends of commercial gain and impermissibly copying it deprives PSI Marine of revenue. Seahorse's imitation pricing guide undoubtedly offers for sale Sea Slide products that compete with PSI Marine's TideSlide products. Indeed, the Supreme Court has cautioned against allowing "the use, for example, of a copyrighted work to advertise a product." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 587 (1994). Just because one does not sell an advertisement itself does not mean it cannot receive copyright protection against infringement, especially by a competitor seeking to advertise substantially the same products, in the same markets. *See Raffoler, Ltd. v. Peabody & Wright*, Ltd., 671 F. Supp. 947, 950 (E.D.N.Y. 1987) ("Advertisements are generally capable of receiving copyright protection, provided that their material [has some minimal degree of creativity or originality] and falls within one of the categories of copyrightable subject matter set forth in 17 U.S.C. § 102."); *MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*, No. 00 CIV.6068(GBD), 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004) (same).

The Copyright Act, in listing acceptable fair uses, concludes that "purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. No reasonable juror could conclude that using a copyrighted work to advertise the same product as in the

43

copyrighted work falls in the same category of intellectual endeavors listed as examples. Since the first factor and the most important fourth factor weigh so heavily in favor or PSI Marine, I conclude as a matter of law that Seahorse's use of the information in PSI Marine's Price Guide did not fall under the "fair use" exception of the Copyright Law.

### 3.    Protectable Elements of Plaintiff's Copyrighted Work

Seahorse also claims that the factual information and spreadsheet layout of PSI Marine's Price Guide are not protectable under copyright law. Def.'s Mem. 35. If the factual information and spreadsheet layout copied by Seahorse do not merit copyright protection, then Seahorse cannot be liable for copyright infringement, and I would be required to rule in Seahorse's favor as a matter of law on Count IX. PSI Marine contends that its selection and arrangement of the particular factual information, as well as its presentation in the table format, reflect a level of originality that merits copyright protection. Pls.' Opp. 36.

"A factual compilation is eligible for copyright if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement. In no event may copyright extend to the facts themselves." *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 350-351 (1991). "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* at 345. "[T]he selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever." *Id.* at 362.

The Supreme Court has rejected copyright protection for telephone white book pages because the widespread prior existence of white pages listing all telephone subscribers in a community, arranged alphabetically, precluded, as a matter of law, a finding of the requisite

creativity. *Id*. "[T]here is nothing remotely creative about arranging names alphabetically in a white pages directory. . . . It is not only unoriginal, it is practically inevitable." *Id.* at 363. Conversely, the Second Circuit has upheld the copyright protection of a selection of 5,000 out of 18,000 baseball cards to be considered "premium." *Eckes v. Card Prices Update*, 736 F.2d 859, 863 (2d Cir. 1984). In addition, the Second Circuit has denied copyright protection for the listing of five items of information concerning municipal bonds because they were "already grouped together in nearly all tombstone ads." *Kregos v. Associated Press*, 937 F.2d 700, 704 (2d Cir. 1991) (citing *Fin. Info., Inc. v. Moody's Invs. Serv., Inc.*, 808 F.2d 204, 208 (2d Cir. 1986)).

At issue in *Kregos* was whether the publication of nine selected sports statistics was entitled to copyright protection. *Kregos*, 937 F.2d at 704. In reversing the district court's summary judgment decision that had denied copyright protection, the Second Circuit concluded: "It cannot be said as a matter of law that in selecting the nine items for his pitching form out of the universe of available data, Kregos has failed to display enough selectivity to satisfy the requirement of originality." *Id.* Likewise here, PSI Marine could have selected any number of different size boats or ways to describe the product sizes in PSI Marine's Price Guide. Instead, with boat weights ranging up to 250,000 pounds in PSI Marines's guide, PSI Marine selected seven subcategories of weight class, along with cross sorting them on the spreadsheet by shaft length, in feet. ECF No. 97-19.[11] Seahorse has not presented any evidence

---

[11] Because there were countless possible ways to describe the different types of boats, I also conclude that the doctrine of merger does not apply. "The fundamental copyright principle that only the expression of an idea and not the idea itself is protectable has produced a corollary maxim that even expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself . . . . Our Circuit has considered this so-called 'merger' doctrine in determining whether

that PSI Marine copied this information from another source, or that other boat sellers typically use the same weight classifications and categories.

Seahorse does argue that PSI Marine's Price Guide was not original because Baluha had received calculations on the TideSlide's specifications from the U.S. Navy. Def.'s Mem. 48. But this assertion, upon closer inspection, only further supports PSI Marine. PSI Marine had a Specifications and General Information chart for the TideSlide, which like the Price Guide, is organized in spreadsheet format with TideSlide shaft lengths and maximum boat load capacities. ECF No. 98-8 (the "Specifications Chart"). When Moran was asked "whether these numbers that we're looking at on the [specifications] chart here were selected based on that information that the U.S. Navy provided," Moran responded, "[s]omewhat." Moran Dep. ECF No. 98-2, at 66:3.

But even assuming Moran simply copied the numbers in the specifications chart from the Navy numbers—this fact would not impact my analysis because the numbers in the specifications chart do not match the numbers in PSI Marine's Price Guide. The specifications chart uses "tons" as a measurement of weight, while the pricing guide uses "lbs." ECF No. 98-8; ECF No. 97-19. Furthermore, even converting tons to lbs., only one of the weight classifications in the specifications chart, 6 tons, actually matches the weight given in the pricing chart, 12,000lbs, while none of the other weights in the specifications chart correspond to those in the pricing chart. *Id.*

---

actionable infringement has occurred, rather than whether a copyright is valid." *Kregos*, 937 F.2d at 705 (internal citations omitted). Because PSI Marine could have used millions of different weight, boat-length, and shaft-length combinations I conclude that Seahorse's use of the factual information in the pricing guide is not protected under the merger doctrine, as Seahorse asserts. *See* Def.'s Mem. 48.

According to the evidence in the record, Baluha created his own categories and specifications for the Price Guide. There were countless theoretically possible classifications of weight and shaft length that PSI Marine could have used to divide the boats specifications. The available evidence all points to the fact that the choice and arrangement of those numbers in the price chart were creative decisions. The Court previously came to the same conclusion in its Opinion denying Seahorse's Motion to Dismiss. ECF No. 68. Although the Court acknowledged it was a close question, the Court concluded "that choosing to arrange the information in the table format, with steel size categories and designations on the X-axis and boat size categories and designations on the Y-axis, entails the minimal degree of creativity necessary to be protectable." *Id.* at 14. The Court acknowledged that the individual facts themselves are not protectable, but the "grouping into various classes of those measurements on a price guide layout, however, is an original compilation of those facts." *Id.* As the Supreme Court concluded, "the originality requirement is not particularly stringent . . . the vast majority of compilations will pass this test." *Feist*, 499, U.S. at 358-59. Therefore, I conclude that as a matter of law that the set of descriptions used by PSI Marine "possesses at least some minimal degree of creativity." *Fiest*, 499 U.S. at 346.

I do agree with Seahorse that the mere use of a spreadsheet format itself for prices is not original enough to merit copyright protection, and I can safely conclude as a matter of law that the grid format on its own is not protected by copyright. *See* Def.'s Mem. 48. Countless businesses use spreadsheet style formatting for prices, and future businesses should continue to do so regardless of PSI Marine's copyright of the Price Guide. The evidence in the record does show PSI Marine's arrangement of descriptions and category titles within that spreadsheet was creative and not copied from other sources.

47

In conclusion, I conclude that no reasonable jury could fail to determine that Seahorse actually copied substantial elements of PSI Marine's Price Guide, that the compilation and arrangement of those factual elements passed the bare minimum of creativity and originality to be protectable under copyright law, and that Seahorse's use of the protectable elements did not constitute fair use. Accordingly, I rule in favor of PSI Marine on Count IX.

### E.    Count XII, CUTPA Violations

PSI Marine moved for summary judgment on Count XII, alleging Seahorse violated the Connecticut Unfair Trade Practices Act (CUTPA). A, Conn. Gen. Stat. § 42-110a, *et seq*. Pls.' Mem. 23. As PSI Marine itself points out, "CUTPA is co-extensive with the Lanham Act in trademark cases." *Lavatec Laundry Tech. GmbH v. Voss Laundry Sols.*, No. 3:13-CV-00056 (SRU), 2018 WL 2426655, at *6 (D. Conn. Jan. 9, 2018) (quoting *Argus Res. Grp. v. Argus Media*, 562 F.Supp.2d 260, 279 (D. Conn. 2008)). Accordingly, since I declined to rule in favor of PSI Marine on Count I-VI that allege violations of the Lanham Act, I will also decline, at this stage, to rule in favor of PSI Marine on Count XII.

## IV.    <u>CONCLUSION</u>

For these reasons, I conclude that genuine issues of material fact exist on the trademark infringement Counts I-VI, Count VIII alleging false advertising, and Count XII, which is coextensive with Counts I-VI. I conclude that no issues of material fact exist as to Count VII and grant Seahorse's motion for summary judgment with respect to Count VII. I also conclude that Seahorse infringed upon PSI Marine's copyrighted TideSlide Price Guide 2022 and therefore grant PSI Marine's Motion for Summary Judgment with respect to Count IX. Plaintiffs' Motion for Partial Summary Judgment is GRANTED in part and DENIED in part,

and Defendant's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part.

**SO ORDERED.**

New Haven, Connecticut
March 31, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge

49